**Joseph Alfred HOLLETT, Plaintiff,**

v.

**DUNDEE, INC., and Andrew E. Mitchell,
Inc., Defendants.**

**Civ. A. No. 2870.**

United States District Court
D. Delaware.

Aug. 9, 1967.

**2**

William D. Bailey, Jr., Bayard, Brill & Handelman, Wilmington, Del., for plaintiff.

Roger Sanders, Prickett, Ward, Burt & Sanders, Wilmington, Del., for defendant Dundee, Inc.

William F. Taylor, Young, Conaway, Stargatt & Taylor, Wilmington, Del., for defendant Andrew E. Mitchell, Inc.

## OPINION

STEEL, District Judge:

In a trial to the jury, plaintiff Joseph Alfred Hollett (Hollett) obtained a verdict upon which judgment was entered of $12,500 against each of the two defendants, Dundee, Inc. (Dundee) and Andrew E. Mitchell, Inc. (Mitchell). Jurisdiction existed by virtue of diversity of citizenship and the amount involved.

Both defendants have moved for judgment n. o. v., or in the alternative, for a new trial. At the close of the evidence defendants moved for a directed verdict and decision thereon was reserved.

The motion of each defendant for judgment n. o. v. contains ten grounds, including those asserted as a basis for its motion for a directed verdict. A motion for judgment n. o. v., however, must be limited to the grounds alleged in the motion for a directed verdict. Lewis v. Mears, 189 F.Supp. 503, 510 (W.D.Pa.1960), aff'd 297 F.2d 101 (3d Cir. 1961), cert. denied 369 U.S. 873, 82 S.Ct. 1142, 8 L.Ed 2d 276 (1962). The grounds of defendants' motions for directed verdicts will be more readily understandable if stated following a recital of the background of the litigation.

The suit arose out of an injury which the plaintiff sustained at about 10 o'clock at night on October 10, 1963 when he fell into a seven feet deep ditch or trench on the premises of the University of Delaware. At the time he was walking from his parked car to Wolf Hall where he was working as a janitor from 11 o'clock at night until 7 o'clock in the morning. Prior to the accident the University had contracted with Dundee to build an addition to Wolf Hall and Dundee had subcontracted the plumbing and heating work to Mitchell. The parties agree that Dundee, in its relation to the University, was an independent contractor, as was Mitchell in its relation to the University and to Dundee.

Some ten days or so before the accident Dundee had gone on the premises to begin work. The contract which it had with the University of Delaware provided for a "contract limit line" delineating the area within which the work was to be done. The contract required Dundee to erect a fence on the contract limit line around the area where the construction was to take place. The erection of the fence was completed on October 1, 1963.

The trench into which the plaintiff fell had been dug by Mitchell for a new sanitary sewer line to run from Delaware Avenue in a southerly direction to Wolf Hall. It was inside the fence which Dundee had built and paralleled it. Both the trench and the fence ran in a north-south direction roughly at right angles with Delaware Avenue. The edge of the trench closest to the fence was about eight or ten feet from it. (See DDX 3). The excavation had taken place between the time when plaintiff went off duty early in the morning of October the 10th and the time when he returned to work at about 10 o'clock on the night of the same day. There was evidence from which the jury could find that eight to ten feet of the easternmost portion of the fence had been torn down close to Delaware Avenue after defendants had left work at about 4:45 in the afternoon of October 10th, and that plaintiff had passed through the opening prior to encountering the trench into which he fell.

At the trial it was contended by defendants that when he was injured plaintiff was a trespasser upon land in the possession of defendants, and that since it was admitted that the defendants did not deliberately or wilfully injure the plaintiff he was not entitled to recovery. Plaintiff, on the other hand, asserted that he was an invitee or under the circumstances later discussed he was properly upon the property where he fell. Upon this premise plaintiff argued that he was entitled to recover if defendants were negligent, their negligence was the proximate cause of his injury, and plaintiff was not contributorily negligent. Implicit in the verdict was a resolution of all of these issues in the plaintiff's favor.

In its motion for a directed verdict, Dundee argued that there was no evidence of a violation of any duty which Dundee owed to the plaintiff, regardless of whether plaintiff was a trespasser or an invitee. It further argued that plaintiff was a trespasser as a matter of law since there was no evidence that the defendants had misled him or impliedly invited him to enter upon the premises inside the fence, and that without such evidence the law applicable to trespassers had to be applied.[1] (R 547–556).

---

1. Plaintiff admitted that if he was found to be a trespasser he could not recover since there was no proof that defendants had wilfully injured him. He also admitted that it was his burden to establish that he was not a trespasser.

Mitchell rested its motion upon the same ground plus the additional one that at the time of the accident the premises were under the sole control of Dundee and, therefore, it (Mitchell) could not be held liable for any condition of the premises which occasioned the injury.

■ Since a directed verdict was not sought upon any ground relating to contributory negligence that issue is not a subject of present concern even though the motion for judgment n. o. v. alleges that judgment should be rendered for defendants upon that ground.[2]

Broadly stated, the question for determination now, is whether under the undisputed facts and that version of the disputed facts and inferences derivable therefrom most favorable to plaintiff, the verdict against the defendants was contrary to law.

The nature of the fence which Dundee erected is not in dispute. It was a standard highway snow fence four feet high, fastened to steel posts which were driven into the ground approximately every ten or twelve feet, and was secured to each post with four strands of wire. The location of the fence is shown on DDX 3 by the dotted red lines, the trench into which plaintiff fell by black lines, and the place where plaintiff fell by a circle in red at the northeast corner of the trench. The portion of the fence through which plaintiff passed to his injury traverses what, prior to the time when the fence was erected, was a parking lot paved with amesite belonging to the University.

Before the fence was erected it was customary for University personnel, and possibly others, to use the entire parking lot as a walkway in going to or from their destination on or in the vicinity of the campus as well as for parking their cars. Plaintiff frequently walked across the parking lot to the back door of Wolf Hall where he worked after he had parked his car on the lot. After Dundee had erected the fence, however, only that portion of the parking lot outside of the fence continued to be used for parking cars or as a walkway. Between the time when the fence was erected and the night of October 10th when he was injured, plaintiff followed the practice of parking his car in the area of the parking lot outside of the fence. Thereafter he had walked in a northerly direction outside of the fence to Delaware Avenue, turned left and proceeded along the sidewalk of Delaware Avenue until he had passed the westernmost contract limit area, turned left again and proceeded to Wolf Hall which he entered through the front door. Plaintiff's habit of walking outside the fence and entering the front door of Wolf Hall, instead of entering by the back door, was due to the fact that, as he testified, he knew of the existence of the fence before the night of the accident and understood that he was not supposed to go into the area which had been fenced off (R 88–9).

■ The defendants argued to the jury that at the time of his injury plaintiff was attempting to take a shortcut through the area where the work was being done. The jury presumably concluded upon the basis of adequate evidence, that he was not. The jury had before it sufficient evidence to find that plaintiff was simply attempting to proceed outside the fence to Delaware Avenue which had been his practice from the time when the fence had been built; but that he had inadvertently strayed through the opening in the fence to the place where he fell, because the fence was down, the area was dimly lighted, and the amesite terrain was the same both inside and outside of the fence. Defendants contend that even if the jury was justified in so finding, as they were, no responsibility for the accident can be attributed to them.

It is an undisputed fact that on the evening in question Dundee's job superintendent left the job site about 4:45 p.m.

**2.** No question of proximate cause was raised in either the motions for directed verdict or in the motions for judgment n. o. v.

and the fence was up and in good condition at that time. He was the last employee of defendants to leave the premises.[3] It is also uncontroverted that from the time the fence was first erected until the time when plaintiff fell into the trench Dundee had never known of the fence being down.

From these undisputed facts defendants argue that the fence must have been pulled down by some third-party after the defendants had left the job, and that there was no reason for defendants to anticipate this occurrence. Hence, it is argued, there is a complete absence of evidence that the defendants did any act that misled the plaintiff or constituted an implied invitation to plaintiff to enter upon the premises where the trench was located. They argue that even if plaintiff was misled into believing that he was on his way to Delaware Avenue over that part of the parking lot which was outside of the fence defendants were not responsible for his mistaken belief.

In charging the jury on the duty of a contractor to persons rightfully present in the area of an excavation and whose presence in the area should reasonably have been expected, the Court said: (R 680)

"It is the duty of contractors to exercise ordinary care under the circumstances; to give warning of the presence of a trench to those persons rightfully present in the area of the trench and whose presence in the area of the trench should be reasonably expected. The warning must be reasonably factual [sic effective] and commensurate with the danger involved. In giving the warning the contractors are to exercise the same standard of care which reasonably prudent contractors use in protecting persons rightfully walking in comparable areas or those whose presence might reasonably have been expected, and to adopt those means of warning or equally factual [sic effective] means which reasonably prudent contractors employ in protecting such persons.

In this connection you may consider what precautions are usually undertaken by contractors in New Castle County to give warnings of the presence of trenches under circumstances comparable to the present situation, to the extent that evidence has been adduced on the subject, and to the extent that you determine such evidence is acceptable to you."

Although the facts were in dispute, the jury had an adequate basis for finding that the duty stated in the above charge had been violated by defendants if the plaintiff were rightfully present in the area and his presence should reasonably have been expected. There was testimony by plaintiff's witness, Harry Prosceno, Chief Building Inspector for the City of Wilmington, to the effect that it was the custom and practice of builders in New Castle County to erect a board fence or barricade around the contract limit line, which would be well lighted completely around the barricade from sun down to sun up as a protection against someone falling into a trench in the construction area (R. 122, 130). Prosceno said that the erection of a snow fence around the contract limit area was not a standard means of barricading such an area, and that in his opinion it was not an acceptable means (R 127). He stated further that the barricade required to protect the public against work being done on the street was different from that needed where the work was being done on private property; that the former could be more temporary, whereas the latter should be more permanent (R 122–123).

A board fence or barricade provided with lights completely around it during the night would have provided third parties with more permanent protection and effective warning against intrusion

---

3. In his address to the jury, the attorney for plaintiff stated that after Taylor, Dundee's superintendent, had left the job, and before plaintiff arrived on the scene, the fence had been pulled away (R 623).

into an open trench on a construction site, than would an unlighted snow fence. Even if it be assumed (unjustifiably) that a more stable type of fence might also have been torn down, a line of lights along the barricade would have more readily enabled a person such as the plaintiff to keep away from the work area when walking from his parked car to Delaware Avenue.

■ If the jury believed Prosceno, as apparently it did, it had a valid basis for finding that the protection and warning which was customary for contractors of New Castle County to give, had not been given by the defendants. Upon this premise, and under the instruction given to it, the jury was justified in finding that defendants had breached the duty they owed to persons rightfully present in the area of the trench and whose presence should reasonably have been expected.[4]

The sole remaining question is whether there was evidence from which the jury might properly find that the plaintiff was rightfully present in the area of the trench and that his presence should have been reasonably expected by defendants. As to this the jury was charged: (R 684)

"If you find that defendants left the premises in such condition as to leave plaintiff reasonably to believe that a public passageway existed through the fence and over the land where plaintiff fell, or to leave plaintiff reasonably to believe that it was permissible for him to pass over the area, then plaintiff must be deemed to be an invitee and not a trespasser."

There appears to be no Delaware law applicable to the problem covered by this charge. It was, however, within the prin-

ciple stated in Restatement, Second, Torts Section 368, Comment i. which the attorney for Mitchell cited in support of defendants' motions for a directed verdict (R 559).[5] He argued that Section 368, Comment i indicates "the factual situation where, after having erected a reasonably safe fence between ditch and highway, the fence had been broken down by a carelessly driven truck so soon after the accident that 'A' has not had an opportunity to replace it with reasonable care and the pedestrian falls in." (R 559–60).

That section and comment reads:

"A possessor of land who creates or permits to remain thereon an excavation or other artificial condition so near an existing highway that he realizes or should realize that it involves an unreasonable risk to others accidentally brought into contact with such condition while traveling with reasonable care upon the highway, is subject to liability for physical harm thereby caused to persons who

\* \* \* \* \* \*

"(b) foreseeably deviate from it in the ordinary course of travel."

\* \* \* \* \* \*

"i. The possessor's obligation is only one of reasonable care in the light of the risk; and he is not liable under the rule stated in this Section where he has taken all reasonable precautions, or has had no opportunity to take them."

Illustration 6, which is given under Comment i. reads:

"6. Under facts similar to those stated in Illustration 1,[6] A would not be liable to B if he had erected a reasonably sufficient fence between the

---

4. It was not suggested in defendants' motions for directed verdict that any breach of duty by defendants which was established, was not a proximate cause of the injury. Nor was the Court requested to instruct the jury on proximate cause in any manner involving the problem of intervening cause. No exception was taken to the proximate cause charge as given (R 679, 692).

5. The attorney for Dundee expressed no dissent.

6. Illustration 1 reads: "A digs a ditch immediately adjacent to a highway upon which his land abuts at a point where cars, though carefully driven, are likely to skid. B's carefully driven car skids off the highway and into the ditch. A is subject to liability to B."

ditch and the highway, but the fence had been broken down by a carelessly driven truck so soon before the accident to B that A had not an opportunity to replace it by the exercise of reasonable care."

Although the parking area outside of the fence was not a public highway, it was an area over which the public was free to walk and for this reason is analogous to the public highway problem to which Section 368, Comment i. is directed.

■ Under the charge the jury could well have found that persons like plaintiff who parked their cars on the parking lot outside the fence were apt to follow the fence to Delaware Avenue and that defendants were chargeable with knowledge of this fact. Since a pedestrian who followed the fence would be within eight to ten feet of the trench, the jury likewise could well have concluded that defendants should have foreseen that, with the area dimly lighted, and the paving inside and outside the fence the same, a pedestrian might deviate from his intended course into the area of the trench unless defendants gave adequate warning and protection by erecting a "sufficient fence", (to use the language of illustration 6 of Section 368), and by placing lights along the fence. Under Comment i, the defendants were immune from liability only if "[they have] taken all reasonable precautions, or [have] had no opportunity to take them." Whether the erection of the snow fence which was unlighted at night, constituted the taking of all reasonable precautions which a contractor in New Castle County would have taken under like circumstances was a jury question.

■ In view of the Court's instruction to the jury, its verdict reflects a finding that defendants maintained the premises so as to leave the plaintiff reasonably to believe that it was permissible for him to pass over the area or that a public passageway existed over which

plaintiff might travel on his way to Delaware Avenue.

The Dundee motions for a judgment n. o. v. and for a directed verdict will be denied. So also must the motions filed by Mitchell unless, as it contends, the construction area was under the sole charge of Dundee and for this reason it can not be held accountable for plaintiff's injury.

Mitchell argues that at the time of the accident, the construction area was under the sole control of Dundee, and for this reason Dundee alone must bear the responsibility for plaintiff's injury. No Delaware law appears to bear up this point.

The factual premise of the argument is not in dispute. Dundee assumed responsibility for the erection and maintenance of the fence surrounding the contract limit lines (R 266–267). Dundee's job superintendent was the last man to leave the worksite (R 314). It was his job to lock and secure the area (R 313). When Mitchell's employees left the job before Dundee's job superintendent had departed, Dundee was in control of the premises.

The question of Mitchell's liability is governed by the principle stated in Restatement, Second, Torts Section 384, which provides:

"One who on behalf of the possessor of land erects a structure or creates any other condition on the land is subject to the same liability, and enjoys the same freedom from liability, as though he were the possessor of the land, for physical harm caused to others upon and outside of the land by the dangerous character of the structure or other condition while the work is in his charge."

■ Restatement, Second, Torts Section 328E defines a possessor of land as:

"(a) person who is in occupation of the land with intent to control it * * * *"

Dundee was the "possessor" of the construction site within the meaning of Section 384.[7]

An independent contractor who works on the land with the authority of the possessor is acting on behalf of the possessor. Section 384, Comment a.; Section 383, Comment a. Mitchell falls within this category of persons which Section 384 deals with. He was an independent contractor working under the authority of Dundee, the possessor of the premises. Therefore, so long as the excavation of the trench was in the charge of Mitchell, when he left the job site, as it undoubtedly was, Mitchell was subject to the same liability as Dundee would have been if he had been the excavator.

Comment e. to Section 384 deals with the liability of a person such as Mitchell when preparatory work is known or should have been known to have been improperly done. It states:

"* * * The particular work entrusted to the contractor, no matter how carefully done, may be safe only if certain preparatory work has been done by others. If so, a contractor who knows or should know that the preparatory work has been improperly done is subject to liability for any bodily harm caused by the fact that his own perfect workmanship has been made dangerous by the improper preparatory work. * * *"[8]

■ The present case involves the question whether the "preparatory work", i. e., the erection of the snow fence without provision for placing lights around it at night afforded adequate protection and warning according to standards of the area to prevent a person in the vicinity from falling into the trench. In view of the testimony of Prosceno previously referred to, the jury could have found, as it apparently did, that the protection and warning which Dundee provided was not adequate. There is also sufficient evidence from which the jury could have found that Mitchell was chargeable with this knowledge. On October 9th employees of Mitchell came on the job site to cut the blacktop paving prior to exacavating the trench (R 461, PX 2H). Marini, Mitchell's foreman, had the opportunity when he left the job site on October 9th and again when he returned to it on the morning of October 10th, to observe the kind of fence which Dundee had built and the absence of any lighting equipment around the fence. Under these circumstances, Section 384 makes Mitchell's liability coextensive with that of Dundee.

■ Downes v. Silva, 57 R.I. 343, 190 A. 42 (1937) is the only authority which Mitchell cites to support the proposition that its lack of control of the area on the night of the accident relieves it of liability. If it can be read as enunciating a principle at variance with Section 384, the latter appears to state the more salutary rule. Certainly if Dundee failed to provide any protection or warning against a person wandering into the trench, it would not be unreasonable to impose upon Mitchell the duty of providing that protection and warning. It is equally reasonable to place the same responsibility on Mitchell if it knew or should have known that the steps taken by Dundee were insufficient to afford the protection and warning which custom in the area demanded. The jury had adequate evidence upon which to make such a finding.

7. Even if the University were deemed to be the possessor, the principle of Section 384 would govern Mitchell's liability. Comment b. of Section 384 states: "It is not necessary that the charge of the erection of the building be entrusted directly by the possessor of land to the person whose liability is in question. It is enough that it is entrusted to such person by anyone whom the possessor has authorized to act on his behalf in such a matter, as where a contractor undertaking to erect a building for the possessor of the land is authorized to sublet the entire undertaking or to make a subcontract for a definite part thereof."

8. This comment is directed to the liability of a "contractor" who is doing work authorized by a "possessor of land". In the context of the instant case, Dundee was the "possessor" and Mitchell was the "contractor".

The principle of Section 384 was not the subject of any specific jury instruction. When Mitchell's attorney discussed its motion for a directed verdict at the close of the evidence, he conceded that if the control which Dundee exercised over the premises did not absolve it from liability as a matter of law, there was no distinction in the duty which Mitchell owed to plaintiff from that owed by Dundee (R 417). The jury was therefore simply instructed, without objection by either party, that the negligence of one party could not be attributed to the other, and that it was possible to return a verdict against either of the parties, both of the parties, or neither of the parties, depending upon which one, or both, had been negligent (R 674).

For the reasons stated the motions of Mitchell for judgment n. o. v. and for a directed verdict must be denied.

The motions for a new trial include as grounds (1) the admission of the testimony of Prosceno as to the custom and practice of contractors in New Castle County in protecting construction areas from intrusion by third parties; (2) the exclusion of the contract between Dundee and the University of Delaware; (3) the denial of a mistrial based upon an alleged prejudicial statement made to the jury in the summation by plaintiff's counsel, and (4) the verdict is contrary to the evidence, the weight of the evidence, and to the law. The reasons for the Court's decisions during the trial pertaining to the first three grounds are adequately stated in the record and need not be repeated (R 120, 270-1, 708-9). The claim that the verdict was contrary to law has been discussed in connection with the motions for judgments n. o. v. There is no reason to set aside the verdict and retry the case because of defendants' claim that it was contrary to the evidence and weight of the evidence. As is frequently true in a jury case, there was sufficient evidence upon which the jury could have returned a verdict either way.

The motions for a new trial will be denied.